## CITY OF KENOSHA ET AL. *v.* BRUNO ET AL.

No. 72–658. Argued April 18, 1973—Decided June 11, 1973

REHNQUIST, J., delivered the opinion of the Court, in which
BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, BLACK-
MUN, and POWELL, JJ., joined. BRENNAN, J., filed a concurring
opinion, in which MARSHALL, J., joined, *post,* p. 516. DOUGLAS, J.,
filed an opinion dissenting in part, *post,* p. 516.

*LeRoy L. Dalton,* Assistant Attorney General of Wisconsin, argued the cause for appellants. With him on the briefs were *Robert W. Warren,* Attorney General, *Michael S. Fisher,* and *Edward A. Krenzke.*

*James A. Walrath* argued the cause and filed a brief for appellees Sleepy's, Inc., et al.

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Appellees, owners of retail liquor establishments, were holders of tavern liquor licenses [1] issued under Wisconsin law by appellants, the cities of Racine and Kenosha. Acting pursuant to Wis. Stat. Ann. §§ 176.05 (1), (8) (1957 and Supp. 1973), the cities denied appellees' applications for renewal of their one-year licenses after holding public "legislative" hearings. Alleging, *inter alia,* deprivations of their Fourteenth Amendment procedural due process rights in such denials and, by amended complaints, the unconstitutionality of §§ 176.05 (1), (8), appellees brought these federal civil rights actions for declaratory and injunctive relief naming in each case only the appropriate municipality as a defendant. The District Court entered temporary restraining orders commanding the immediate issuance of licenses and convened a three-judge district court pursuant to 28 U. S. C. § 2281 to rule on the constitutionality of the statutory licensing procedure. Thereafter, the Attorney General of Wisconsin was allowed to intervene as a party defendant on his own motion. On cross-motions for summary judgment, the

---

[1] In the case of appellee Misurelli, it appears from the record that his partner was actually the holder of the expired license. The District Court held, however, that in substance his application was no different from those of the other appellees.

District Court declared the statute unconstitutional and enjoined its enforcement. This direct appeal followed.

Under the Wisconsin local licensing scheme, the governing bodies of municipalities are authorized to grant liquor licenses "to such persons entitled to a license under this chapter as they deem proper to keep places within their respective towns, villages, or cities for the sale of intoxicating liquors. . . ." Wis. Stat. Ann. § 176.05 (1) (1957).[2] The statutory scheme has been interpreted by the Wisconsin Supreme Court to require a "legislative type of hearing wherein one is given notice of the hearing and a fair opportunity to state his position on the issue," in situations where municipalities have denied an application for renewal of a license. *Ruffalo* v. *Common Council,* 38 Wis. 2d 518, 524, 157 N. W. 2d 568, 571 (1968). Such applications may not be rejected "without a statement on the clerk's minutes as to the reasons for such rejection," Wis. Stat. Ann. § 176.05 (8) (Supp. 1973),[3] and the state courts have certiorari jurisdiction to

---

[2] Wis. Stat. Ann. § 176.05 provides:

"(1) Authority to grant licenses. Each town board, village board and common council may grant retail licenses, under the conditions and restrictions in this chapter contained, to such persons entitled to a license under this chapter as they deem proper to keep places within their respective towns, villages, or cities for the sale of intoxicating liquors. No member of any such town board, village board or common council shall sell directly or indirectly or offer for sale, to any person, firm, or corporation that holds or applies for any such license any bond, material, product, or other matter or thing that may be used by any such licensee or prospective licensee in the carrying on of his or its said business."

[3] Wis. Stat. Ann. § 176.05 provides:

"(8) Annual license meetings. All town and village boards and common councils, or the duly authorized committees of such councils, shall meet not later than May 15 of each year and be in session from day to day thereafter, so long as it may be necessary, for the purpose of acting upon such applications for license as may be

review whether such refusals by the councils are arbitrary, capricious, or discriminatory. *Ruffalo* v. *Common Council, supra.*

In the case of the Racine denials,[4] it was stipulated that the question of the appellees' applications for licenses was referred to the License and Welfare Committee of the Common Council and that at public hearings conducted by that Committee, appellees were present and heard oral objections to the renewal of the licenses for their taverns.[5] After holding a public hearing, the Common Council followed the Committee's recommendation and voted to deny the applications, apparently because of the adverse effects on the community of nude dancing in the bars.

It was also stipulated that at all meetings, all persons including appellees were given an opportunity to speak, but no speaker was sworn. None of the testimony was recorded and no verbatim transcript was made. Appellees were not advised that they could cross-examine any of the speakers, and they did not request

presented to them on or before April 15, and all applications for license so filed shall be granted, issued or denied not later than June 15 for the ensuing license year, provided that nothing shall prevent any governing body from granting any licenses which are applied for at any other time. As soon as an application has been approved, a duplicate copy thereof shall be forwarded to the secretary of revenue. No application for a license which is in existence at the time of such annual license meeting shall be rejected without a statement on the clerk's minutes as to the reasons for such rejection."

[4] The Racine denials were utilized by the District Court as the basis for the main opinion holding the Wisconsin scheme unconstitutional and the other cases were decided on the basis of the main opinion. We are therefore primarily considering the factual background of the Racine denials in our disposition.

[5] No such stipulation was filed for appellee Robers, however.

such an opportunity. And there was no advance written specification of the charges against any of the bars.

Relying on two Seventh Circuit decisions,[6] the three-judge court (as had the single judge) held that "in light of the equitable nature of this action" it had jurisdiction pursuant to 28 U. S. C. § 1343 (3).[7] Concluding that Racine's interest in being able to deny the renewal of liquor licenses with no other safeguard than a legislative hearing is "minimal," the court balanced that interest against that of appellees, assertedly their occupations and their investments, and determined that the Due Process Clause of the Fourteenth Amendment requires municipalities to grant an "adversary-type hearing in which the applicant is given timely notice of the reasons urged for denial [of renewal of his license] and an opportunity to present, confront, and cross-examine witnesses under oath with a verbatim transcript." 346 F. Supp. 43, 51.

I

Neither party to the appeal has questioned the jurisdiction of the District Court, but "it is the duty of this court to see to it that the jurisdiction of the [district court], which is defined and limited by statute, is not exceeded." *Louisville & Nashville R. Co.* v. *Mottley,* 211 U. S. 149, 152 (1908). Appellees alleged that they brought

---

[6] *Schnell* v. *City of Chicago,* 407 F. 2d 1084 (1969), and *Adams* v. *City of Park Ridge,* 293 F. 2d 585 (1961).

[7] Title 28 U. S. C. § 1343 provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . ."

their action under 42 U. S. C. § 1983,[8] and that the District Court therefore had jurisdiction under 28 U. S. C. § 1343. The District Court agreed. The only defendants named in the complaints, however, were the municipalities of Kenosha and Racine. In considering the reach of § 1983 in *Monroe* v. *Pape,* 365 U. S. 167 (1961), this Court examined the legislative history surrounding its enactment and said:

> "The response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by the Act of April 20, 1871, was so antagonistic that we cannot believe that the word 'person' was used in this particular Act to include them." *Id.,* at 191.

The District Court relied on *Schnell* v. *City of Chicago,* 407 F. 2d 1084 (CA7 1969), and *Adams* v. *City of Park Ridge,* 293 F. 2d 585 (CA7 1961), in holding that *Monroe* was limited to actions for damages, and that cities were proper defendants under § 1983 where equitable relief was sought. *Adams, supra,*[9] in turn, relied on this Court's *per curiam* opinion in *Holmes* v. *City of Atlanta,* 350 U. S. 879 (1955). But in none of the three opinions in *Holmes* was the issue of whether or not a municipality is a "person" within the meaning of § 1983 discussed. The authority of that case as support for

---

[8] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[9] The court in *Schnell* v. *City of Chicago, supra,* simply followed the previous circuit decision in *Adams* v. *City of Park Ridge, supra,* with no independent analysis.

the proposition that a city is a "person" under § 1983 where equitable relief is sought, but is not a "person" under the same section where damages are prayed for, is at least seriously weakened by the following observation in *Monroe, supra,* at 191 n. 50:

> "In a few cases in which equitable relief has been sought, a municipality has been named, along with city officials, as defendant where violations of 42 U. S. C. § 1983 were alleged. See, *e. g., Douglas* v. *City of Jeannette,* 319 U. S. 157; *Holmes* v. *City of Atlanta,* 350 U. S. 879. The question dealt with in our opinion was not raised in those cases, either by the parties or by the Court. Since we hold that a municipal corporation is not a 'person' within the meaning of § 1983, no inference to the contrary can any longer be drawn from those cases."

We find nothing in the legislative history discussed in *Monroe,* or in the language actually used by Congress, to suggest that the generic word "person" in § 1983 was intended to have a bifurcated application to municipal corporations depending on the nature of the relief sought against them. Since, as the Court held in *Monroe,* "Congress did not undertake to bring municipal corporations within the ambit of" § 1983, *id.,* at 187, they are outside of its ambit for purposes of equitable relief as well as for damages. The District Court was therefore wrong in concluding that it had jurisdiction of appellees' complaints under § 1343.

As previously noted, after the complaints had been filed and issue joined, the Attorney General of Wisconsin was allowed to intervene as a party defendant in the actions. The District Court, having concluded that it had jurisdiction to entertain the original complaints under § 1343, understandably did not address itself to the question of

whether the intervention of the Attorney General as a party would cure the jurisdictional defect which we now find to exist in appellees' complaints. The District Court also observed that "were not civil rights jurisdiction proper, each of the plaintiffs herein would be able to assert the necessary . . . controversy requirement of Title 28 U. S. C. § 1331." 346 F. Supp., at 50. But although appellees in the Racine denials alleged jurisdiction pursuant to 28 U. S. C. § 1331 as well as § 1343, and in each complaint there was an allegation of an investment in a tavern of at least $20,000, the defendant municipal corporations answered by putting the appellees to their proof as to the amount in controversy. Since the cases were submitted and decided on cross-motions for summary judgment and stipulations of fact, and no stipulation as to the amount in controversy was filed, we cannot say on this state of the record whether or not jurisdiction over the complaints was affirmatively established. See *Hague* v. *CIO*, 307 U. S. 496, 507–508 (1939), and cases therein cited. With respect to the Kenosha denials, there was a stipulation as to jurisdictional amount in the proceedings before the single-judge District Court, and an allegation of the requisite jurisdictional amount in the amended complaint, which for the first time challenged the constitutional validity of the Wisconsin statutory licensing scheme. No answer was filed to the amended complaint prior to the entry of judgment by the District Court.

We have had the benefit of neither briefs, arguments, nor explicit consideration by the District Court of the jurisdictional questions presented by the intervention of the Attorney General as a party, and the availability of § 1331 jurisdiction in view of the state of the record below. We therefore remand the case to the District Court for consideration of these issues.

## II

Appellees' licenses have been neither revoked nor suspended. Their claim of deprivation of Fourteenth Amendment procedural due process rights arises from the failure of the cities of Kenosha and Racine to hold full-blown adversary hearings before refusing to renew their one-year licenses. Our decisions last year in *Board of Regents* v. *Roth,* 408 U. S. 564 (1972), and *Perry* v. *Sindermann,* 408 U. S. 593 (1972), discussed the nature of "liberty" and "property" that is protected against denial without due process by the Fourteenth Amendment. The District Court did not discuss these recent cases, and it followed, in part, the decision of the Court of Appeals for the Seventh Circuit which was reversed in *Roth.* It, therefore, made no evaluation of "property" or "liberty" interests which might require a due process hearing, or of the nature of such a hearing if it were required in the light of our opinions in *Roth, supra,* and *Perry, supra.*

The District Court, also, did not have the benefit of this Court's decision in *California* v. *LaRue,* 409 U. S. 109 (1972). There we held again that while the Twenty-first Amendment did not abrogate a requirement of procedural due process, *Wisconsin* v. *Constantineau,* 400 U. S. 433 (1971), it did grant the States broad authority over the distribution and sale of liquor. We also held that regulations prohibiting the sale of liquor by the drink on premises where there were nude but not necessarily obscene performances were facially constitutional.

We, therefore, direct the District Court, after addressing the issue of jurisdiction, to reconsider its judgment in the light of *Roth, Perry,* and *LaRue.* The judgment of the District Court is vacated and the cause is remanded for proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, concurring.

Although I join the opinion of the Court, I would add that I find unimpeachably correct the District Court's conclusion that appellants failed to comply with the requirements of the Due Process Clause in denying renewal of appellees' liquor licenses. Nevertheless, since the defendants named in the complaints were the municipalities of Kenosha and Racine, jurisdiction cannot be based on 28 U. S. C. § 1343. *Moor* v. *County of Alameda,* 411 U. S. 693 (1973); *Monroe* v. *Pape,* 365 U. S. 167 (1961). Appellees did assert 28 U. S. C. § 1331 as an alternative ground of jurisdiction, but I agree with the Court's conclusion that existence of the requisite amount in controversy is not, on this record, clearly established. If appellees can prove their allegation that at least $10,000 is in controversy, then § 1331 jurisdiction is available, *Bell* v. *Hood,* 327 U. S. 678 (1946); cf. *Bivens* v. *Six Fed. Narcotics Agents,* 403 U. S. 388 (1971), and they are clearly entitled to relief.

Mr. Justice Douglas, dissenting in part.

I have expressed my doubts in *Moor* v. *County of Alameda,* 411 U. S. 693, 722 (dissenting opinion), that our decision in *Monroe* v. *Pape,* 365 U. S. 167, bars equitable relief against a municipality. In that case the legislative history* on which that construction of "person" as used in 42 U. S. C. § 1983 was based related to the fear of mulcting municipalities with damage awards for unauthorized acts of its police officers. *Monroe* v. *Pape* may be read as containing *dicta* that a remedy by way of declaratory relief or by injunction is barred by § 1983 as well as suits for damages. Yet I do not think we should decide that question without full briefing and considered argument.

*See the Appendix to this opinion.

I do, however, concur in a remand for reconsideration by the District Court in light of *Board of Regents* v. *Roth,* 408 U. S. 564, *Perry* v. *Sindermann,* 408 U. S. 593, and *California* v. *LaRue,* 409 U. S. 109.

## APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS, DISSENTING IN PART

The holding in *Monroe* v. *Pape* that municipalities are not subject to suits for damages under § 1983 was based largely on Congress' rejection of the Sherman Amendment, which would have provided compensation for individuals from the county, city, or parish for any damage caused by riots, etc. Two theories were expressed in the debates for rejecting the amendment.

The first was the notion that civil liability for damages might destroy or paralyze local governments. Also, it was thought unjust that local governments (and indirectly the citizenry at large) should be subject to damages when they bore no responsibility. Although the Senate passed the amendment, Senator Stevenson stated in opposition:

> "This amendment wholly ignores the municipal liability created by the omission of direct, absolute corporate duty. We are now, for the first time, presented with an enactment which undertakes to create a corporate liability for personal injury which no prudence or foresight could have prevented. . . .
>
> "But, Mr. President, this amendment is clearly unconstitutional. If it is attempted to be carried out it will destroy the municipal government of every city and the local government of every county where this liability is created . . . . Let a judgment be recovered against any of our cities in the East or West and a lien is by this amendment created

not only upon the municipal property of such city, but upon every dollar in the city treasury. The credit of the city, the means to discharge its contracts and its most solemn obligations are by the operation of this act to be applied to such judgment.

"I have heard no reason for such a lien. If carried out to its full extent, it must prove utterly destructive of the State municipalities! And whence does the Federal Government derive its power in any manner or form to touch the revenues of the State governments or any of its agencies? . . ." Cong. Globe, 42d Cong., 1st Sess., 762.

Senators Casserly and Bayard expressed similar concerns. *Id.*, at 763–764, 776.

In the House, Congressman Kerr stated:

"There is, therefore, a total and absolute absence of notice, constructive or implied, within any decent limits of law or reason. And the bill itself is significantly silent on the subject of notice to these counties and parishes or cities. Under this section it is not required, before liability shall attach, that it shall be known that there was any intention to commit these crimes, so as to fasten liability justly upon the municipality. . . . It takes the property of one and gives it to another by mere force, without right, in the absence of guilt or knowledge . . . ." *Id.*, at 788.

See also *id.*, at 791 (statement of Cong. Willard). And Congressman Farnsworth was concerned that the amendment would "put the hand of the national Government into [local government's] treasury." *Id.*, at 799.

There was another strain, however. Congressman Brooks viewed the amendment as raising the old struggle between the Federalists and the Democrats. *Id.*, at 790.

In the words of Congressman Poland, one of the House managers of the Conference Committee, "[w]ith these local subdivisions we have nothing to do. We can impose no duty upon them; we can impose no liability upon them in any manner whatever." *Id.*, at 793. He stated further:

> "But the enforcing a liability, existing by their own contract, or by a State law, in the courts, is a very widely different thing from devolving a new duty or liability upon them by the national Government, which has no power either to create or destroy them, and no power or control over them whatever. . . .
>
> ". . . Counties and towns are subdivisions of the State government, and exercise in a limited sphere and extent the powers of the State delegated to them; they are created by the State for the purpose of carrying out the laws and policy of the State, and are subject only to such duties and liabilities as State laws impose upon them." *Id.*, at 794.

After the House finally had defeated the Sherman Amendment and the Conference substitute for the amendment, Poland stated:

> "I did understand from the action and vote of the House that the House had solemnly decided that in their judgment Congress had no constitutional power to impose any obligation upon county and town organizations, the mere instrumentality for the administration of State law." *Id.*, at 804.

See also *id.*, at 795 (statement of Cong. Burchard), 799 (statement of Cong. Farnsworth).

To the extent that the Sherman Amendment was directed only at liability for damages and the devastating effect those damages might have on municipalities, it

seems that the defeat of the amendment does not affect the existence *vel non* of an equitable action. One may, of course, argue that the sweeping statements of Poland and others that Congress had no constitutional power (however defective that argument is in light of developed constitutional doctrine) to authorize any action against a subdivision of state government indicated a purpose to go the whole way and not allow even injunctive relief against a municipality. But this is a matter which the Court has never faced.