**Renault ROBINSON and Afro-American Patrolmen's League, an Illinois not-for-profit corporation, Plaintiffs,**

**v.**

**James B. CONLISK, Jr.,* et al., Defendants.**

**No. 70 C 2220.**

United States District Court, N. D. Illinois, E. D.

April 24, 1974.

---

* JAMES M. ROCHFORD (substituted 3/14/74 as new Superintendent).

Thomas A. Gottschalk, Kirkland & Ellis, Gary M. Elden, John W. Conniff, John P. Wilson, Jr., James A. Cherney, Chicago, Ill., for plaintiffs.

William R. Quinlan, Daniel R. Pascale, Richard F. Friedman, Ann Acker, Jer-

ome A. Siegan, Michael Small, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

MARSHALL, District Judge.

Before me is defendants'[1] motion to reconsider their motions to strike and dismiss and for summary judgment.

Plaintiffs Renault Robinson [hereafter "Robinson"], a Black policeman employed by the Chicago Police Department [hereafter "the Department"] and the Afro-American Patrolmen's League [hereafter "the League"], a not-for-profit corporation organized by Black Department members, challenge the Department's practices in the areas of promotion, assignments and discipline as violations of the First, Fifth, Thirteenth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1981 and 1983.

This case presents sensitive issues for determination. Plaintiffs, on one hand, properly seek vindication of their federally guaranteed civil rights. Assuredly, there is great value in securing an end to any unlawful practices in the areas of promotion, hiring, and assignments of police officers. Defendants, on the other hand, contest the posture of the case for the court to intervene into the affairs of the Department and insist that the case be presented, if at all, by and against the proper parties.

The defendants set forth five grounds in support of their motion: (1) the City and the Board move to dismiss the Second Amended Complaint on the grounds that the court lacks jurisdiction under 28 U.S.C. § 1343(3) since the City and the Board are not subject to suit under §§ 1981 and 1983 of the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983; (2) the City and the Board move to dismiss the Second Amended Complaint on the grounds that the court lacks jurisdiction under 28 U.S.C. § 1331, since Robinson and the League do not meet the requisite jurisdictional amount thereunder; (3) all defendants move to dismiss Count 2 of the Second Amended Complaint on the grounds that Robinson and the League lack standing to sue; (4) all defendants move to dismiss the allegations of Count 2 regarding the discriminatory nature of the Department's promotion examinations; and (5) all defendants move to dismiss the Second Amended Complaint on the grounds that plaintiffs do not state a justiciable controversy.

## THE SECOND AMENDED COMPLAINT

Count 1 of the complaint alleges that Robinson and the League have been subjected to unequal standards, punishment and treatment for the purposes of harassment in violation of the 1st, 5th and 14th Amendments to the Constitution of the United States and 42 U.S.C. § 1983. Count 2 alleges that League members, including Robinson, have been discriminated against on racial grounds by defendants' practices regarding the hiring, assignment and promotion of police officers in violation of the 5th, 13th and 14th Amendments and 42 U.S.C. §§ 1981 and 1983.

## JURISDICTION OF THE CITY AND THE BOARD UNDER 28 U.S.C. § 1343(3)[2]

The City and the Board argue that the plaintiffs are precluded from prosecuting their claims under §§ 1981 and

---

1. The defendants in this action are James B. Conlisk, Jr., The City of Chicago [hereafter "the City"], Paul W. Goodrich, Raymond J. Hauser, Marlin Johnson, Rev. Wilbur Daniel, Lewis F. Perch, the Police Review Board of the City of Chicago [hereinafter "the Board"] and James Rochford.

2. 28 U.S.C. § 1343(3) provides: "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any persons:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulations, custom or usage, or any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

1983 of the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983, on the grounds that neither the City nor the Board is a "person" within the meaning of the Civil Rights Act.

Section 1983 of the Civil Rights Act provides:

> Every person who, under color of any statute, ordinance, regulations, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

■ The Supreme Court held in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that § 1983 was intended to provide private parties a cause of action for abuses of official authority which resulted in the deprivation of constitutional rights, privileges and immunities. The Court found, however, that a municipality was not a "person" under § 1983. City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), extended the *Monroe* holding that municipal corporations are not "persons" for the purposes of a damage action under § 1983 to an action for equitable relief under § 1983. Thus, to the extent that violations of § 1983 are alleged in Counts 1 and 2 of the Second Amended Complaint, the City and the Board are not subject to suit for such violations. This fact, however, does not deprive the court of jurisdiction over the alleged violations of plaintiffs' constitutional rights in Count 1 since jurisdiction is also founded on 28 U.S.C. § 1331. *Infra,* p. 536.

The City and the Board argue that *Monroe* and *Bruno* preclude suits against them under all sections of the Civil Rights Acts, including § 1981.

Section 1983 was derived from § 1 of the Ku Klux Klan Act of April 20, 1871. When the 1871 Act was debated in the Senate, Senator Sherman of Ohio proposed an amendment which provided in material part:

> That if any home, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down, burned, or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together; and if such offense was committed to deprive any person of any right conferred upon him by the Constitution and law of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the inhabitants of the county, city or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense if living, or to his widow or legal representative if dead; and such compensation may be recovered by such person or his representative by a suit in any court of the United States of competent jurisdiction in the district in which the offense was committed, to be in the name of the person injured, or his legal representative, and against said county, city or parish. . . . Cong.Globe, 42d Cong. 1st Sess. 704.

After having been adopted by the Senate, the House rejected it.

The Conference Committee reported another version of the amendment which provided in material part:

> That if any house, tenement, cabin, shop, building, barn, or granary shall be unlawfully or feloniously demolished, pulled down, burned or destroyed, wholly or in part, by any persons riotously and tumultuously assembled together; or if any person shall unlawfully and with force and violence

be whipped, scourged, wounded, or killed by any persons riotously and tumultuously assembled together, with intent to deprive any person of any right conferred upon him by the Constitution and law of the United States, or to deter him or punish him for exercising such right, or by reason of his race, color, or previous condition of servitude, in every such case the county, city or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense, if living, or to his *widow* or legal representative if dead; and such compensation may be recovered in any action on the case by such person or his representative in any court of the United States of competent jurisdiction in the district in which the offense was committed, such action to be in the name of the person injured, or his legal representative, and against said county, city, or parish and in which action any of the parties committing such acts may be joined as defendants. . . . Cong. Globe, 42d Cong. 1st. Sess. 755.

After extended debate the House rejected the second amendment adopting in its stead a provision which dropped municipal liability and made liable "any person or persons, having knowledge that any" wrongs prohibited by the Act were being committed. 42 U.S.C. § 1986.

■ The purpose of the 1871 Act was to counteract the rising tide of terrorism in the southern states, led by the Ku Klux Klan. The extent of such terrorism was fully documented in extensive Senate hearings. The type of testimony given in such hearings is set forth in the remarks of Representative William Stoughton, who stated in part:

The evidence taken before the Senate Committee in relation to the outrages, lawlessness and violence in North Carolina establishes the following propositions:

(1) That the Ku Klux organization exists throughout the State, has a po-

litical purpose, and is composed of the members of the Democratic or Conservative party.

(2) That this organization has sought to carry out its purposes by murders, whippings, intimidation, and violence against its opponents.

(3) That it not only bends its members to execute decrees of crime, but protects them against conviction and punishment, first by disguises and secrecy, and second, by perjury, if necessary, upon the witness-stand and in the jury box.

(4) That of all the offenders in this order, which has established a reign of terrorism and bloodshed throughout the State not one yet has been convicted. . . . Cong.Globe, 42d Cong. 1st Sess. 320. *See* also, Representative Stevenson's remarks at Cong. Globe 42d Cong., 1st Sess. 283–300.

The legislative history of the 1871 Act, upon which the *Monroe* decision was based, establishes that the objection to the Sherman amendment was a concern over the constitutional power of Congress to impose civil liability on municipalities based on the violent acts of third persons. Illustrative of the objection to the Sherman amendment were the remarks of Representative Farnsworth:

We have a section which authorizes suits to be brought against counties and cities in every case of destruction of property or injury of the person by two or more persons in a riotous or tumultuous manner, when it is done in derogation of the exercise of some constitutional right of the person, or done on account of color, or race, or previous condition of servitude; such, for instance . . . as this: if a Chinaman should be mobbed by three or four miners in California or Nevada on account of being a Chinaman, he may sue the county in the United States courts and recover damages. Or, to take another case of a man mobbed in Illinois on account of race or color, suppose a colored and a white

person get married, and some of the young men of the village get up a *charivari* not for the purpose of preventing any right to vote, but because of color, then the person claiming that he is injured may sue the county and recover damages.

. . . So this section provides, and that too in an action of tort, in an action *ex delicto,* where the county has never entered into any contract, where the State has never authorized the county to assume any liability of the sort or imposed any liability upon it. It is in my opinion simply absurd. . . . Cong.Globe, 42d Cong. 1st Sess. 798–799.

The overriding unfairness to local governments in imposing liability upon them for the actions of third parties over whom they had no control also underlay the objections to the Sherman amendment. Representative Kerr of Indiana stated:

There is, therefore, a total and absolute absence of notice, constructive or implied, within any decent limits of law or reason. And the bill itself is significantly silent on the subject of notice to these counties and parishes or cities. Under this section it is not required, before liability shall attach, that it shall be known that there was any intention to commit these crimes, so as to fasten liability justly upon the municipality. . . . It takes the property of one and gives it to another, without right, in the absence of guilt or knowledge. . . . Cong. Globe, 42nd Cong., 1st Cong., 1st Sess. 788.

■ Section 1981 of the Civil Rights Act, 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and pro-ceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In its original form § 1981 was part of § 1 of the Civil Rights Act of 1866.[3] That section was cast in sweeping terms:

*Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled,* That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulations, or custom, to the contrary notwithstanding.

For our purposes, the language that all citizens are guaranteed "the same right, in every State and Territory in the United States, to make and enforce contracts . . . as is enjoyed by white citizens . . ." is the key. To the Congress that passed the Civil Rights Act of 1866, it was clear that the right to do these things might be infringed by "custom or prejudice" and by "State or local law." Jones v. Mayer Co., 392 U.S. 409, 423, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Thus, in providing that the right to make and enforce contracts was

---

3. Act of April 9, 1866, c. 31, § 1, 14 Stat. 27, re-enacted by § 18 of the Enforcement Act of 1870, Act of May 31, 1870, c. 114, § 18, 16 Stat. 140, 144, and codified in § 1977 and § 1978 of the Revised Statutes of 1874, now 42 U.S.C. §§ 1981 and 1982.

to be enjoyed equally by all, Congress intended to secure that right against interference from any source.

The objections made to the 1866 Civil Rights Act were based on the broad coverage of the Act. The remarks of Representative Kerr, speaking against the 1866 Act, exemplify the objections:

This bill forbids any discrimination in civil rights and immunities on account of race or color. Under the laws of Indiana no person except male inhabitants can be allowed to engage in the business of retailing spirituous liquors. But a negro procures the requisite petition and applies to a county board for a license to retail liquors. It is refused. Now, this discrimination is based both upon color and race. And the county board, by refusing the license, violates the second section of this act[4] . . . . Or, the city of New Albany, in which I live, whose ordinances follow the State law, might refuse a license to a negro under the same circumstances, and the common council would thus become wrongdoers. . . . Cong.Globe, 39th Cong., 1st Sess. 1270–1271.

In plain and unambiguous terms, § 1981 grants to all persons the same right to make and enforce contracts and to the full and equal benefit of all law. Section 1981 prohibits all discrimination, whether it be by individuals, municipalities or police review boards. I cannot ignore the legislative history and the broad language of § 1981. Section 1981 means what it says: all discrimination is prohibited, regardless of whether the source of the discrimination is a municipal corporation.

The City and the Police Review Board, protected from suit under § 1983, are subject to suit under § 1981.[5] Count 2 of the complaint alleges discriminatory and arbitrary practices by the City and the Police Review Board in the management and operation of the Chicago Police Department. The unfairness of holding a municipality liable under § 1983 for the acts of a third person, over whom the municipality has no direct control, is not present when the type of conduct alleged is that which is engaged in by the municipality itself and is covered by § 1981. Consequently, I find jurisdiction over the City and the Board in Count 2 under 28 U.S.C. § 1343.

The City and the Board argue that Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), applies the *Monroe* and *Bruno* limitations of § 1983 to all other sections of the Civil Rights Acts.

*Moor* was a suit against certain police officers and the County of Alameda for damages arising from injuries allegedly suffered by the plaintiffs as a result of the wrongful discharge of a shot gun by a County deputy sheriff. Against the County, the plaintiffs alleged federal causes of action under §§ 1983 and 1988[6] as well as pendent state claims.

4. Section 2 provided in part "That any person who, under color of any law, statute, ordinance, regulations, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude . . . than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor." Implicit in Representative Kerr's statement is that the term "person" in § 2 includes municipalities.

5. I am not alone in my holding: see United States ex rel. Washington v. Chester Co.

Police Dept., 294 F.Supp. 1157 (E.D.Pa. 1969) ; United States ex rel. Washington v. Chester Co. Police Dept., 300 F.Supp. 1279 (1969) ; 1972 U.S.Code Cong. & Admin. News, p. 2154 where the House Education and Labor Committee expresses the view that the 1972 amendment of Title VII, 42 U.S.C. § 2000e et seq., which allows state and local government employees to sue the appropriate governmental unit for employment discrimination, is co-extensive with the remedies available under § 1981. Thus, Congress interprets § 1981 as allowing suits against municipalities.

6. Section 1988 provides: "The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this

As to the Civil Rights Act claims, the County moved to dismiss, contending that it was not a "person" under § 1983. The plaintiffs argued that § 1988 incorporated into federal law California's law of vicarious liability which exposed the County to liability.

The Court held for the County, finding that § 1988 was only intended to instruct federal courts as to what law to apply in causes of action under the federal civil rights acts. Since *Monroe* and *Bruno,* supra, held that there could be no cause of action against a municipality under § 1983, § 1988 was not applicable. Concisely stated, the Court held that § 1988 could not be used to create a federal cause of action by importing a state cause of action against a municipality into federal court. Thus, *Moor* does not face the issue of whether the other sections of the Civil Rights Act are subject to the *Monroe* and *Bruno* limitation of § 1983.

Accordingly, the motion of the City and the Board to dismiss Count 2 of the complaint on the grounds that they are not subject to suit under § 1981 of the Civil Rights Act [and consequently for lack of jurisdiction under 28 U.S.C. § 1343(3)] is Denied.

### JURISDICTION OF THE CITY AND THE BOARD UNDER 28 U.S.C. § 1331 [7]

■ Robinson and the League allege in Counts 1 and 2 of the Second Amended Complaint *inter alia* that League members, including Robinson, have been denied promotions and increases in pay; that League members, including Robinson, have been subjected to suspensions from the Department with loss of pay and vacation days with pay; that Robinson has lost $30,000 as a result of suspensions and pay forfeitures; and that the League has been handicapped in retaining members, recruiting new members and obtaining community and financial support, the direct result of which has been a loss of financial support to the League in the amount of $100,000.[8]

From the good faith allegations of the complaint, supported by affidavits, it appears that the claim of each plaintiff exceeds $10,000, exclusive of interest and costs. Consequently, jurisdiction of this action also lies under 28 U.S.C. § 1331.

Accordingly, the motion of the City and the Board to dismiss the complaint on the grounds that the court lacks jurisdiction under 28 U.S.C. § 1331(a) is Denied.

### STANDING

■■ Defendants argue that Robinson and the League do not have standing to prosecute the claims of Count 2 of the Second Amended Complaint.[9] Count 2 alleges the existence of Department-wide patterns and practices in the areas of promotion, discipline and assignments, the consequence of which has been to affect adversely all Black policemen [in-

chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

7. 28 U.S.C. § 1331 provides in material part: "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws or treaties of the United States."

8. Exhibits A–HII are affidavits of League members, including Robinson which support the allegations of the complaint.

9. Robinson sues individually and the League sues on behalf of its members.

cluding members of the League] in contravention of the Fifth, Thirteenth and Fourteenth Amendments.

Defendants contend that Robinson has failed to allege any injury from the action that he is assailing, and thus, lacks standing to litigate his claims under Count 2.[10] The League, defendants argue, cannot sue on behalf of its members until it shows an injury to the organization distinct from that to its membership.[11] The defendants contend that the League, having failed to establish such an injury, lacks standing to prosecute the claims of Count 2.

Exhibit "I" to plaintiffs' memorandum in opposition to defendant's motion for reconsideration is an affidavit submitted by Robinson, in which he states that he is a member of the League and that he has been subjected to the discriminatory acts alleged in paragraph 22 of Count 2. Robinson has established sufficient personal interest in obtaining the relief sought so as to have standing to prosecute Count 2. Accordingly, defendants' motion to dismiss Robinson from Count 2 of the Second Amended Complaint is Denied.

The remaining standing issue before me is whether the League has standing to assert the constitutional rights of its members. The League urges that it may assert, on behalf of League members, a right personal to them to be protected from discriminatory employment practices in promotion, discipline and assignments.[12]

In NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), Alabama sought to compel the NAACP, a foreign corporation, to produce the internal documents of the organization, including the names and addresses of its members. The NAACP refused to disclose the membership lists and was, thereafter, held in contempt. The Supreme Court, in holding that the disclosure of the NAACP's membership lists would violate the members' right of association and assembly under the due process clause of the Fourteenth Amendment, held that the NAACP had standing to assert the rights of its members.

The Court found *inter alia* that the NAACP was likely to suffer diminished membership if the production were compelled,[13] that the nature of the right [freedom of assembly and association] ranked high on the hierarchy of constitutional values,[14] that the relationship between the NAACP and its members was more than formal membership, since the purpose of the organization was to protect the rights of Blacks and others who were interested in the welfare of the Negro race;[15] that it was impracticable to require the individual members

10. See Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). This case remains the classic statement on the doctrine of standing.

11. Concisely stated, defendants argue that the League must have standing to sue in its own right before it can sue on behalf of its members.

12. On March 16, 1973, a judge of this court dismissed Count 2 of the first amended complaint on the grounds that plaintiffs lacked standing to represent all non-League member Black policemen and Black applicants. In dictum, however, he stated that "The League's right to represent its own members especially when injury to them has a direct and immediate effect upon the rights of the League itself is well established [by] NAACP v. Alabama, 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488] (1958)."
Subsequently, Robinson and the League filed a second amended complaint in which

Count 2 alleges the existence of racial discrimination by the Chicago Police Department, adversely affecting League members in the areas of promotion, discipline and assignments.

13. 357 U.S. at 459–460, 78 S.Ct. 1163. This possibly might have established standing for the NAACP to sue individually had it been seeking to enjoin enforcement of the state action. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), where the prospective withdrawal of patrons furnished grounds for standing; Barrows v. Jackson, 346 U.S. 249, 255–256, 73 S.Ct. 1031, 97 L.Ed. 1586 (1952).

14. 357 U.S. at 466, 78 S.Ct. 1163.

15. The Court emphasized that "The association . . . is but the medium through which its individual members seek to make more effective the expression of their own views." 357 U.S. at 459, 78 S.Ct. at 1170.

**538**

to prosecute the suit for if individuals filed suit, their rights would be nullified by the very act of assertion.[16]

In the present case, if the members of the League are required to sue individually, they might reasonably expose themselves to the imposition of extra-legal sanctions by the defendants. Such action by the defendants would result in diminished financial support and membership in the League. In view of this fact, the League might have standing to sue on its own behalf, if it sought an injunction against the defendants' alleged conduct.[17] Moreover, the purpose [18] for which its members join the League is to protect their rights and interests jointly.[19] Since the League is the collective embodiment of its members, the League has standing to protect its members' rights against encroachment by third parties.

The alleged practices of the defendants deal with the members of the League, not as individuals, but as members of a class [20] of which the League is a representative. McCabe v. Atchison, Topeka & Santa Fe Ry., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914), involved a state statute permitting railroads to provide sleeping cars and other facilities for only whites. While the Court declared that the statute violated the equal protection clause of the Fourteenth Amendment, the Court held that the plaintiffs, a group of Blacks, had no standing to secure injunctive relief against such discrimination because they had not been harmed by the action of the railroad. The effect of *McCabe* was to preclude plaintiffs from vindicating their rights until after they had been violated. In view of the fact that it may be difficult for an individual class member of the League to have standing to sue to protect his civil rights until they are violated, the League should be able to challenge the alleged conduct against the class members whose interests the League exists to protect.

Freedom from racial discrimination is the constitutional right sought to be protected. While the nature of the right asserted does not *per se* compel a finding that the League has standing,[21] it is a factor which, when coupled with other circumstances, inspires a greater sensitivity to the League's ability to sue on behalf of its members. Certainly, freedom from discrimination ranks high on the constitutional hierarchy and deserves close protection by the courts.[22]

16. The rights at issue were the members' rights to remain anonymous and keep their membership in the association secret. To require each member to individually sue would effectively destroy those rights. 357 U.S. at 459, 78 S.Ct. 1163.

17. *Supra*, note 5 at 535.

18. The League was organized by Black members of the Chicago Police Department to improve relations between the Department and the predominantly Black communities of Chicago and to improve relations between themselves and the Department. Paragraph 3 of the Second Amended Complaint.

19. In NAACP v. Alabama, the Court referred to the identity of interests between the association and its members by stating: "Petitioner is the appropriate party to assert these rights, because it and its members are in every practical sense identical." 357 U.S. at 459, 78 S.Ct. at 1170.

20. League members are Black members of the Chicago Police Department.

21. See, for example, Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919), where a witness, called before a grand jury investigating official misconduct, refused to answer questions on the ground that the statute, under which the grand jury was called, was unconstitutional. Since the witness was not subject to indictment under the challenged statute, the Court held that he lacked standing to litigate the constitutionality of the statute. The high value of the right involved did not move the Court to grant standing.

22. See Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1952), involving a suit brought by the covenantee of a restrictive covenant based on race against a covenantor, a white person, who had conveyed the property to a Black. No Black was a party to the litigation but the Court held that the white vendor had standing to assert that enforcement of the covenant against him by way of damages would deny equal protection of unknown Black vendees. See

To the extent that a significant rather than a fortuitous relationship can be shown, the nature of the relationship is important as to whether there is standing.[23] In the present case, the relationship involved was that between the League and its members. The alleged constitutional violations relate to the purpose of such membership, *viz.*, freedom from racial discrimination.[24] Certainly, the League is the "medium through which its individual members seek to make more effective the expression of their views" and thus has a significant relationship with its members. 357 U.S. at 459, 78 S.Ct. at 1170.

Finally, in order to sue individually, the League members would expose themselves to extra-legal sanctions of the Department. Thus, for the individual members of the League to file suit is impracticable. Furthermore, standing may be permitted, even though the individual could effectively assert his own rights.[25]

The criteria which the Court considered decisive in NAACP v. Alabama, *supra*, are satisfied in the present case. The League's nexus with its members is sufficient to permit it to act as their representative in contesting the alleged discriminatory practices of defendants as alleged in Count 2 of the Second Amended Complaint. Accordingly, defendants' argument that the Association lacks standing to assert the constitution-al rights pertaining to its members, who are not parties to the litigation, is rejected.

The allegations of paragraph 22 of Count 2 adequately allege the League's standing to sue.[26] Accordingly, defendants' motion to dismiss the League from Count 2 is denied.

## PROMOTION EXAMINATIONS AND QUALIFICATIONS

■ All defendants move to dismiss the allegations of Count 2 of the Second Amended Complaint regarding the Department's promotion examinations and qualifications on the grounds that they have no power or control over promotion of police officers. Defendants assert that the Civil Service Commission of the City is the proper party defendant as to these claims.

The Civil Service Commission provides for promotions in the Department on the basis of merit, seniority and examination. Ill.Rev.Stat. ch. 24, §§ 10–1–13, 10–1–14. The members of the Commission, however, are appointed by the Mayor of Chicago and are paid by the City of Chicago. Ill.Rev.Stat. ch. 24, § 10–1–1. Consequently, the City effectively controls the Civil Service Commission and thus the process of promotion in the Department.

The practices of the Department are directly in issue. Thus, Conlisk, Rochford, the Board and the members there-

---

also Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and its progeny.

23. See, for example, McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), involving a situation where there was no pre-existing relationship between plaintiffs and the third party. Employees of a store who were convicted for violating a Sunday closing law were denied standing to allege that the statute infringed upon the religious freedom of those who kept sabbath on a day other than Sunday. *Contra*, NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), and Louisiana v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L. Ed.2d 301 (1961).

24. See Joint Anti-Facist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Jackson concurring), wherein it is suggested that under certain circumstances the relationship of an association and its members is sufficient to support the association's standing to sue on behalf of its members.

25. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ; Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047 (1923).

26. The affidavits of League members submitted by the League [Exhibits A–HH] in support of its response to defendants' motion for reconsideration, further supports the League's standing to sue.

of who are named as defendants are proper parties under Count 2.

Accordingly, defendants' motion to dismiss on the grounds that they have no control over promotion in the Department is denied.

## JUSTICIABILITY

■ All defendants move to dismiss the Second Amended Complaint on the grounds that it fails to state a justiciable controversy. The apparent basis of defendants' motion is the alleged inability of the court to fashion a remedy that would not involve it with the daily administration of the Department. Defendants contend that such involvement is best left to the legislative and executive branches of government.

The legal issues involved in the present case regarding the alleged discriminatory nature of the hiring and promotion of City police officers have been considered by other courts. Bridgeport Guardians, Inc., et al. v. Members of the Bridgeport Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1972). The types of equitable remedies which properly may be invoked once a finding of unlawful discrimination has been made are varied. See Arnold v. Ballard, 5 E. P.D. ¶ 8630 (N.D.Ohio May 14, 1973); Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D.Md. 1973).

Accordingly, defendants' motion to dismiss the Second Amended Complaint on this ground is denied.

Thereupon, it is ordered that defendants' motion to reconsider their motion to strike and dismiss and for summary judgment is denied.

Defendants Conlisk, City of Chicago, Goodrich, Hauser, Johnson, Daniel, Perch, the Police Review Board and Rochford are ordered to answer the Second Amended Complaint in 20 days.

* JAMES M. ROCHFORD (substituted 3/14/74 as new Superintendent).