Natherlean G. KELLY et al.,
Plaintiffs-Appellants,

v.

WEST BATON ROUGE PARISH
SCHOOL BOARD et al.,
Defendants-Appellees.

No. 74–1240.

United States Court of Appeals,
Fifth Circuit.

Aug. 7, 1975.

Rehearing Denied Sept. 12, 1975.

Murphy W. Bell, Baton Rouge, La., for plaintiffs-appellants.

Charles H. Dameron, 1st Asst. Dist. Atty., Port Allen, La., for defendants-appellees.

Before RIVES, WISDOM and COLEMAN, Circuit Judges.

RIVES, Circuit Judge:

The two plaintiffs[1] were black teachers in the West Baton Rouge School District. Each of them had been a probationary, nontenured teacher[2] for as

[1] The parties will be referred to as they originally appealed.

[2] Under LSA–R.S. 17:442, reading in pertinent part:

"Each teacher shall serve a probationary term of three years to be reckoned from the date of his first appointment in the parish or city in which the teacher is serving his probation. During the probationary term the parish or city school board, as the case may be, may dismiss or discharge any probationary teacher upon the written recommendation of the parish or city superintendent of schools, as the case may be, accompanied by valid reasons therefor.

"Any teacher found unsatisfactory by the parish or city school board, as the case may be, at the expiration of the said probationary term, shall be notified in writing by the board that he has been discharged or dis-

much as two and one-half years or more at the time she received a letter from the defendant Lutz as Superintendent of the Parish Schools, dated August 8, 1969, the body of which is quoted in the margin.[3] Each of the plaintiffs was interviewed pursuant to a letter from Mr. Lutz, dated June 7, 1971, quoted in the margin,[4] but neither was reappointed. At the time of entry of the district court's judgment, December 4, 1973, neither of them had been reappointed to a teaching position in the Parish Schools, nor has either been so reappointed to date.

The plaintiffs' claimed in substance:

(1) That they were victims of racial discrimination, meaning racial discrimination according to the standards applied prior to this Court's decisions in *United States v. Jefferson County Board of Education,* 5 Cir. 1967, 380 F.2d 385, 394, and in *Singleton v. Jackson Municipal Separate School District,* 5 Cir. 1970, 419 F.2d 1211, 1220;

(2) that they were laid off without notice or hearing and thus denied due process;

(3) that at the time they were laid off, the defendants had not adopted or made available for public inspection any written standards or criteria for the selection of teachers to be laid off within the requirements of *Singleton, supra*;

(4) that the failure to reappoint them for the 1971–72 school year or for any subsequent year violated their right to recall or preference before employment of new teachers of a different race or color, established in *Jefferson* and *Singleton, supra.*

The district court expressed in its opinion the view that the case against the School Board must be dismissed for lack of jurisdiction, but nonetheless ruled on the plaintiffs' contentions on their merits[5] and ordered the entry of judgment in favor of the defendants. This appeal is from a judgment "in favor of defendants, West Baton Rouge Parish School Board, L. C. Lutz, Superintendent, West Baton Rouge Parish Schools, and against plaintiffs remaining in the matter at the time of trial, Natherlean G. Kelly and Patsy L. Harrington, dis-

---

missed; in the absence of such notification, such probationary teacher shall automatically become a regular and permanent teacher in the employ of the school board of the parish or city, as the case may be, in which he has successfully served his three year probationary term . . . ."

3. "The West Baton Rouge Parish School Board has been ordered by the U. S. Federal District Court to reorganize its school system effective at the beginning of the 1969–70 school session. As a result of implementing this federal court order, we have determined that the school system is over-staffed. Therefore, it is with much regret that I have to inform you that you have not been re-appointed to a teaching position in the West Baton Rouge Parish Schools for the 1969–70 school session."

Plaintiffs' Exhibits 1 and 2.

4. "We are in the process of interviewing prospective teachers for the 1971–72 school session. If you are interested in making an appointment for an interview, please contact the School Board Office at 343–8809 and ask for either Superintendent Lutz or Mr. English."

Plaintiffs' Exhibits 4 and 5.

5. The opinion reads in part:

"Neither the complaint, nor the proofs, establish a claim upon [which] relief could be granted against the defendant, L. C. Lutz, because it is abundantly clear from the record that Mr. Lutz does not have the authority to hire or fire teachers, nor does he do so. That authority lies with and is exercised by the School Board alone. Thus there has been no valid claim stated or proved against Mr. Lutz. Secondly, this Court does not have jurisdiction of this claim under 28 U.S.C.A. § 1343 insofar as the defendant West Baton Rouge Parish School Board is concerned because the School Board is not a natural person and cannot be made a defendant under the provisions of 42 U.S.C.A. § 1983. See *City of Kenosha v. Bruno,* [1973, 412] U.S. [507], 93 S.Ct. [2222] 37 L.Ed.2d 109 (1973); *Dr. Joe W. Campbell v. Charles Slay, Jr., et al.,* 399 F.Supp. 30 (W.D.La.—Oct. 24, 1973). Thus, for these reasons alone, this case must be dismissed.

"But out of an abundance of caution, the plaintiffs were given an evidentiary hearing before this Court on October 29, 1973, and the evidence adduced clearly shows, even on the merits, that the plaintiffs are not entitled to the relief which they seek." (R. 40)

missing plaintiffs' suit at their costs." (R. 43)

We do not agree that the case against the School Board must be dismissed for lack of jurisdiction. On the merits, we affirm the rulings of the district court as to grounds (1), (2) and (3), listed, *supra,* and reverse as to ground (4).

 The complaint sought injunctive relief and claimed damages to each plaintiff in the amount of $10,000 plus loss of wages. Neither of the defendants denied that the matter in controversy exceeded $10,000 exclusive of interest and costs, or raised any other question as to the jurisdiction of the district court. The pretrial order approved by the parties and entered by the court provided that, "Basis for jurisdiction is set forth in the complaint" (App. 11). We do not find it necessary to decide whether *City of Kenosha v. Bruno,* 1973, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109, applies to a school board for several reasons. (a) The action arose under 42 U.S.C. § 1981, if not under § 1983,[6] and jurisdiction was properly grounded upon 28 U.S.C. § 1343. (b) Federal jurisdiction under 28 U.S.C. § 1331 may also be invoked, though that section is not relied upon in the complaint. *Paynes v. Lee,* 5 Cir. 1967, 377 F.2d 61, 63; Wright & Miller, Federal Practice & Procedure Civil, § 1206 n. 66. (c) In appropriate circumstances, this Court may exercise its discretion not to decide the "*Kenosha*" question. *Mitchell v. West Feliciana Parish School Board,* 5 Cir. 1975, 507 F.2d 662, 666, 667. Such circumstances exist here, because in this case "*Kenosha*" does not go to the jurisdiction of the court but does suggest questions of remedy, parties and procedure which have not been reached. One such question concerning the Eleventh Amendment to the Constitution of the United States is discussed in *Scheuer v. Rhodes,* 1974, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90. Another such question is

whether executive immunity[7] protects the members of the school board and the school superintendent from liability for damages and lost wages. We express no opinion on those questions. Though our reasoning is different, we follow the same course as did the district court, and proceed to a decision of the merits.

 (1) We agree that there was no sufficient evidence that either the members of the School Board or the Superintendent were motivated by racial discrimination (measured by standards prior to *Jefferson* and *Singleton, supra*) in terminating the plaintiffs' employment or in failing to rehire them. Plaintiffs were among several nontenured teachers laid off in August, 1969. The district court found "At that time fourteen Negro teachers were involuntarily terminated along with twenty-seven white teachers, eight of whom were involuntarily laid off and nineteen of whom voluntarily resigned" (R. 39). The Board anticipated that pupil enrollment for the 1969–70 school year would decline because of the dissatisfaction of white parents with the court-ordered integration which followed the direction of the Supreme Court that,

> "Under explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools. *Griffin v. School Board,* 377 U.S. 218, 234, 84 S.Ct. 1226, 1235, 12 L.Ed.2d 256 (1964); *Green·v. County School Board of New Kent County,* 391 U.S. 430, 438–439, 442, 88 S.Ct. 1689, 1694–1695, 1696, 20 L.Ed.2d 716 (1968)."

*Alexander v. Holmes County Board of Education,* 1969, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19.

At the close of the 1968–69 school year, the Parish schools had a pupil enrollment of 2460 Blacks and 2500 Whites, or 49.6% Blacks and 50.4% Whites. (Supp.R., 46.) Mr. Lutz testified:

---

**6.** See Cook v. Advertiser Company, M.D.Ala. 1971, 323 F.Supp. 1212, 1213 n. 3, *aff'd,* 5 Cir. 1972, 458 F.2d 1119.

**7.** Also discussed in *Scheuer, supra,* and in the later case of Wood v. Strickland, 1975, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214.

"The succeeding years, starting in '68—I mean '69–'70, of course, our white enrollment dropped considerably, down to practically 150 whites, I believe, at the beginning of that year, and around 2300 blacks. I have those figures somewhere here. Percentagewise at the beginning of the year, the first week or so of the school year, it was ninety-four per cent black and six per cent white. The whites pulled out. Along about the end of the year, the whites built back up from approximately one hundred fifty to five hundred four. Which we closed out roughly with about eighty-two per cent or eighty-two point five per cent black, and seventeen point five per cent white.

"Of course, as the years—and I have each year, the whites have progressively increased. I can give you round figures now of around fifteen hundred whites and twenty-two or twenty-two fifty blacks." (Supp.R., 47.)

■ The number of teachers at the beginning of the 1968–69 school year had been reduced from 250—of whom 128 were Black and 122 White, to 208—of whom 107 were Black and 101 were White. More white teachers than black teachers were hired during the years immediately following desegregation. That may be partially explained by the fact that no black teachers resigned and a considerable number of the white teachers did resign. From one of the exhibits we have extracted a table of the numbers of teachers in the Parish system at various times from 1969 to 1974, which is shown in the margin.[8] Absent the *per se* requirements of *Jefferson* and *Singleton, supra,* those figures are not so significant as to cause us to set aside the district court's holding that neither the Board nor the Superintendent was motivated by racial discrimination. It is clear that the district court had no reference to either the *Jefferson* or the *Singleton* decision in its ruling of no racial discrimination.

(2) As to the second ground, the plaintiffs did not have tenure, and the Board's decision not to rehire them was not influenced by racial discrimination nor was it part of a plan to integrate the school system.

■ This Court has held that, under circumstances not constituting a deprivation of "liberty," there is no constitutional right to a hearing before discharge of nontenured teachers who have no property interest in continued employment. See *Robinson v. Jefferson County Board of Education,* 5 Cir. 1973, 485 F.2d 1381. The Louisiana statute[9] involved here and the Alabama statute[10] construed in *Robinson, supra,* are significantly similar. LSA–R.S. 17:442 provides that a probationary (*i. e.,* nontenured) teacher may be dismissed for "valid reasons." The reason in this case was a reduction in teaching positions because of an enrollment decline. The Alabama statute allowed the school board to discharge nontenured teachers for "sufficient cause." One such cause mentioned in the contract in *Robinson* was "decrease of the number of teaching positions." 485 F.2d at 1382 n. 1. The Alabama statute does not provide for a property interest in nontenured school teachers, and the Louisiana statute is to like effect. *Robinson, supra,* is also instructive as to the plaintiffs' claim of some deprivation of liberty. The discharge there was for use of profanity in class, inefficiency, incompetency, and inability to relate to students.

---

8.

| | Black | White | Total |
|---|---|---|---|
| At end of 1968–69 school term | 128 | 122 | 250 |
| July 25, 1969—Date of Desegregation Decree | | | |
| Before school started, 1969 | 107 | 101 | 208 |
| After school started, 1969–70 | 107 | 80 | 187 |
| Before school started, 1970–71 | 96 | 97 | 193 |

| | Black | White | Total |
|---|---|---|---|
| Before school started, 1971–72 | 98 | 108 | 206 |
| Before school started, 1972–73 | 95 | 111 | 206 |
| Before school started, 1973–74 | 95 | 112 | 207 |

9. See n. 2, *supra.*

10. Code of Ala., Tit. 52, § 86 (1958).

In the present case, the cause of plaintiffs' not being reemployed was the reduction in teaching positions. The mere fact that nonretention by a school system might make a teacher less attractive to other school systems does not constitute deprivation of liberty so as to entitle the teacher to a pretermination hearing. *Calvin v. Rupp,* 8 Cir. 1973, 471 F.2d 1346, 1349. Since there was no stigma, there could be no deprivation of liberty.

■ (3) The plaintiffs were laid off by the letter dated August 8, 1969.[11] That was before *Singleton, supra,* was decided. The defendants could not anticipate *Singleton*'s subsequent holding that the criteria used in selecting the teacher to be laid off "shall be available for public inspection." Clearly, that part of *Singleton* is not retroactive. See *Bassett v. Atlanta Independent School District,* 5 Cir. 1973, 485 F.2d 1268; *Sparks v. Griffin,* 5 Cir. 1972, 460 F.2d 433; *Lee v. Macon County Board of Education,* 5 Cir. 1971, 453 F.2d 1104.

(4) In this Circuit as early as 1967 the *Jefferson County* decision established specific rights to recall or preference of teachers "displaced as a result of desegregation." (380 F.2d 394.)

"(b) *Dismissals.* Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy."

380 F.2d 385, 394.

Effective February 1, 1970, the *Singleton* decision recognized or established even more definite rights to recall or preference of teachers "dismissed or demoted" as a result of desegregation:

"If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. *In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.*" (Emphasis added.)

419 F.2d 1211, 1218.

The district court, in its opinion here, wrote as follows:

"Plaintiffs also complain that in the years following their termination other teachers were hired, many of whom were white, and even though they, the plaintiffs, were interviewed by the School Board, they were not re-hired. But the evidence shows that all prospective teachers, including the plaintiffs, were thoroughly interviewed and evaluated by a bi-racial evaluation committee and written and published non-racial objective criteria, as required by *Singleton, et al. v. Jackson Municipal Separate School District, et al.,* 419 F.2d 1211 (CA5—1970), were non-discriminatorily applied." (R., 41.)

■ It is clear that the district court used the wrong standard and failed to recognize that the plaintiffs had any right to recall or preference. The evidence shows clearly and without dispute that no such preference was accorded either plaintiff.

There is no question but that each plaintiff was a qualified elementary school teacher. Each had had two and one-half years or more experience teach-

11. Quoted in n. 3, *supra.*

ing in the West Baton Rouge Parish School System. They would have become "regular and permanent teachers" (LSA–R.S. 17:442) if they had not failed to get reappointed for the 1969–70 school session. The letter expressed "much regret" that they had not been reappointed. In his testimony, Superintendent Lutz repeatedly emphasized the basis of such regret. "We did not discharge these people—I want you to understand, because they were doing poor work; we discharged them because we were overstaffed." (Supp.R., 45; see also Supp.R., 69.)

Until July 1971 there were no definite standards or criteria for ranking teachers. Mr. Lutz testified:

"Q. Now, in 1969, when you ranked teachers, did you give your supervisors some objective criteria by which they could do the ranking?

"A. More or less what we did is how they felt from what they saw in the classrooms, what they thought about teachers in general, what they felt, who was doing the best job. No set criteria." (Supp.R., 69.)

"A. Well, as I stated before in '69 through '71 school year we were trying to keep in mind this particular Court Order that says we are not telling them to make a school black or white, and we hired them trying to fulfill this court order as best we could; and, of course, from '71 on— July of '71 we started applying these standards, or these criteria here with the interviewing team interviewing teachers and selecting the best qualified. Now, to answer your question, from '71 on, I assume that this interviewing team did not feel that these were the best qualified as far as the applicants they interviewed. Now, my directions were specific to them and from the Board that 'you will hire the best qualified person for the job.' Before that time we tried to, as I say, employ teachers to keep them balanced in race, according to this—to carry out this Court Order." (Supp.R., 70–71.)

"A. I think at this particular time all vacancies had been filled by this particular interviewing team and certainly I didn't see any need to make an exception. I feel they should have the opportunity if they so wish to come along, to come to the office and ask for an interview—we requested that they come for an interview, to treat all people fairly and give them all the same opportunity.

"Q. Well, my point is, I'm trying to find out, you say they were not dismissed because of any type of incompetency or any type of other deficiency. The fact that both had worked some two and half years in your parish and had been dismissed because of overstaffing, would you not have considered that that might have given them some credit or some advantage over the other teachers who were subsequently employed who had not worked at all?

"A. No. I didn't feel—I didn't feel that I was required or we were required to give them a job. I'm sure there were other people that came in who had been teaching two, three and four years." (Supp.R., 71–72.)

Since *Jefferson* and *Singleton, supra,* this Circuit has consistently enforced the rights of teachers, displaced as a result of desegregation, to preference in reappointment. For example, in *Adams v. Rankin County Board of Education,* 5 Cir. 1973, 485 F.2d 324, 326, the Court said:

"Having carefully reviewed the case, we conclude that the problem is that the District Court used the wrong legal standard. Under the law in this Circuit, new teachers may not be hired merely because their qualification, even if viewed by objective racial ceiteria, exceed those of the displaced former teachers. If the former teachers are minimally qualified for the jobs they are to receive them. We announced this principle in United States v. Jefferson County Board of Education, 5 Cir., 1967, 380 F.2d 385, 394."

In the recent case of *Ward v. Kelly,* 5 Cir. 1975, 515 F.2d 908, Judge Thornberry, writing for the Court said:

"The school district evaluated Ward against the other principals in the district. Based on the results of those comparative evaluations, and the recommendation of Ward's superior, D. G. Kealhofer, principal of Yazoo City Junior High School, the Superintendent of Schools decided not to renew Ward's contract for 1970–71. Even assuming the standards used to evaluate Ward as a principal were sufficiently objective, the school board still had an obligation to offer Ward any position for which he was qualified before filling the vacancy with a person of a different race, color, or national origin. Adams v. Rankin Cty. Bd. of Educ., 485 F.2d 324, 326–27 (5th Cir. 1973); Singleton v. Jackson Mun. Sep. Sch. Dist., 419 F.2d 1211, 1218 (5th Cir. 1969), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970); United States v. Jefferson Cty. Bd. of Educ., 380 F.2d 385, 394 (5th Cir. 1967). This the school district failed to do." (p. 911)

Judge Thornberry also held "clearly violated Singleton's requirement that the district give Ward the right of first refusal for a position for which he is qualified." (p. 912)

The evidence is clear that the plaintiffs are entitled to be reappointed to their positions as teachers at least from the time of their interviews in response to the June 7, 1971 letters quoted in n. 4, *supra.* They may be entitled to reappointment from an earlier date.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.