Witt CAMPBELL, Plaintiff-Appellee Cross Appellant,

v.

GADSDEN COUNTY DISTRICT SCHOOL BOARD et al., etc., Defendants-Appellants Cross Appellees.

No. 75–1998.

United States Court of Appeals, Fifth Circuit.

July 2, 1976.

Rehearing and Rehearing En Banc Denied Sept. 17, 1976.

Brian T. Hayes, Tallahassee, Fla., Richard J. Gardner, Quincy, Fla., for defendants-appellants.

Kent Spriggs, Tallahassee, Fla., Jack Greenberg, James C. Gray, Jr., New York City, for plaintiff-appellee.

Before GEWIN and AINSWORTH, Circuit Judges, and MARKEY,* Chief Judge.

AINSWORTH, Circuit Judge:

In the process of complying with a final desegregation order issued by the United States District Court for the Northern District of Florida in August of 1970, the Gadsden County School Board transferred Witt Campbell, a black, from a principalship at a black elementary school which was being phased out to an assistant principalship at a high school. Campbell subsequently instituted this action,[1] claiming that his reassignment was imposed on him in violation of *Singleton v. Jackson Separate Municipal School District*, 5 Cir., 1969, 419 F.2d 1211, *cert. denied*, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970), which prohibits discriminatory demotion or dismissal of faculty and professional staff displaced by the unification of previously segregated school systems, and that accordingly, he is entitled to a position as an elementary school principal, back pay, compensatory seniority, and reasonable attorneys' fees.

Campbell has been employed by the Gadsden County Board of Public Instruction since 1934, and served as principal in a series of black elementary schools until the County's dual school system was eliminated in 1970. Although he had thirty years of administrative experience and was the senior administrator in the Gadsden County system at the time of the final desegregation order, he was transferred in order to avoid "bumping" either of two recently appointed white principals, neither of whom had actually administered an elementary school as principal while school was in session at the time of Campbell's transfer. The District Court issued a permanent injunction, ordering the Gadsden County District School Board, the Superintendent of Schools, and individual members of the Board to assign Campbell to a position as an elementary school principal beginning with the 1975–76 school year. A motion for stay of the injunction pending appeal was denied. The court further held that Campbell was entitled to attorneys' fees, but denied his claim for back pay. Maintaining that no *Singleton* violation occurred, appellants challenge the award of injunctive relief and attorneys' fees; appellee has preserved the back pay issue by appropriate cross appeal.

### I. Jurisdiction

As a preliminary matter, appellants contend that the District Court was

---

* Of the U.S. Court of Customs and Patent Appeals, sitting by designation.

1. Campbell originally sought class action relief, but this was denied by the District Court on the ground that the appropriate channel for securing class relief would be through intervention in the ongoing Gadsden County School desegregation case. In the interest of efficiency, the District Court retained jurisdiction over Campbell's particularized complaint under *Singleton v. Jackson Separate Municipal School District*, 5 Cir., 1969, 419 F.2d 1211, *cert. denied*, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970).

without jurisdiction to adjudicate Campbell's claim. They argue that *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), which held that injunctive relief was not available against a city under 42 U.S.C. § 1983, since a city is not a "person" for purposes of that statute, and *Adkins v. Duval County School Board*, 5 Cir., 1975, 511 F.2d 690, which held that school boards are not "persons" for purposes of section 1983, preclude federal court jurisdiction in this case.[2] This line of rea-

soning overlooks the fact that jurisdiction under 28 U.S.C. § 1343[3] was asserted not only in connection with a section 1983 cause of action,[4] but also in conjunction with claims arising directly under the Fourteenth Amendment of the United States Constitution[5] and under 42 U.S.C. §§ 1981[6] and 1985.[7] In light of several recent cases sustaining section 1343 jurisdiction with regard to section 1981 claims alleging racial discrimination[8] in employment, *see, e. g.,*

2. Circuit court analysis on the issue of whether or not school districts or state (or state related) universities are "persons" under section 1983 has not been uniform. *Compare Adkins v. Duval County School Bd.*, 5 Cir., 1975, 511 F.2d 690; *and Sellers v. Regents of University of California*, 9 Cir., 1970, 432 F.2d 493, 500, *cert. denied*, 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971) (indicating that section 1983 jurisdiction is improper) *with Aurora Education Ass'n East v. Board of Education of Aurora Pub. School Dist. No. 131*, 7 Cir., 1974, 490 F.2d 431, 435, *cert. denied*, 416 U.S. 985, 94 S.Ct. 2388, 40 L.Ed.2d 762 (1974) (suggesting that section 1983 jurisdiction is available).

3. 28 U.S.C. § 1343 provides:

> The district courts shall have original jurisdiction of any *civil action authorized by law* to be commenced by any person:
>
> .    .    .    .    .
>
> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
>
> (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(Emphasis supplied). Because of the phrase "civil action authorized by law," section 1343 jurisdiction is unavailable in the absence of an appropriate cause of action. In this sense, failure to state a claim under sections 1981, 1983 and 1985 or other appropriate legal authority has the effect of depriving federal courts of subject matter jurisdiction under section 1343. *See Harkless v. Sweeny Indep. School Dist.*, S.D.Tex., 1975, 388 F.Supp. 738, 745 & n. 4.

4. 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes

to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

5. Because we conclude that jurisdiction under section 1981 is available in this case, we need not consider whether the Fourteenth Amendment creates *ex proprio vigore* a cause of action capable of serving as the basis of section 1343 jurisdiction under the circumstances of this case. *See* note 3, *supra; cf. Paul v. Davis*, —— U.S. ——, ——, 96 S.Ct. 1155, 1157, 47 L.Ed.2d 405, 44 U.S.L.W. 4337, 4339 (1976).

6. 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

7. Section 1985 provides, in substance, that *persons* who conspire to deprive individuals of their civil rights may recover damages against any one or more of the conspirators for the deprivation or injury suffered. Like section 1983, section 1985 derives from the Ku Klux Klan Act of 1871, and liability is limited by its language to "persons." Section 1985 jurisdiction is thus no broader than that under section 1983.

Federal question jurisdiction was also asserted under 28 U.S.C. § 1331, but the record does not affirmatively establish the existence of an amount in controversy in excess of $10,000. *Cf. Kenosha, supra*, 412 U.S. at 514, 93 S.Ct. at 2227.

8. The fact that these cases uniformly involve racial discrimination reflects a significant restriction on the range of actions that may be

*Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 1720 & n. 6, 44 L.Ed.2d 295, (1975); *Kelly v. West Baton Rouge Parish School Bd.*, 5 Cir., 1975, 517 F.2d 194, 197; *Cooper v. Allen*, 5 Cir., 1974, 493 F.2d 765, 766 n. 1; *Penn v. Schlesinger*, 5 Cir., 1973, 490 F.2d 700, 701–03, *rev'd on other grounds*, 5 Cir., 1974, 497 F.2d 970 (en banc ); *Caldwell v. National Brewing Co.*, 5 Cir., 1971, 443 F.2d 1044, *cert. denied*, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972); *Sanders v. Dobbs Houses, Inc.*, 5 Cir., 1970, 431 F.2d 1097; *see also Runyan v. McCrary*, —— U.S. ——, 96 S.Ct. 2586, —— L.Ed.2d ——, 44 U.S.L.W. 5034 (1976); *McDonald v. Santa Fe Trail Transportation Co.*, —— U.S. ——, 96 S.Ct. 2574, —— L.Ed. 2d ——, 44 U.S.L.W. 5067 (1976),[9] we af-

brought under section 1981. In *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968), while expounding the scope of section 1982, the companion section to section 1981, *see* note 9, *infra*, the Supreme Court was careful to note that

> "[w]hatever else it may be, 42 U.S.C. § 1982 is not a comprehensive open housing law. In sharp contrast to the Fair Housing Title (Title VIII) of the Civil Rights Act of 1968, . . . the statute in this case deals only with racial discrimination and does not address itself to discrimination on grounds of religion or national origin."

Our court has construed section 1981 broadly enough to embrace claims regarding employment discrimination on the basis of alienage. *Guerra v. Manchester Terminal Corp.*, 5 Cir., 1974, 498 F.2d 641, 653–55. It should be noted, however, that the discrimination against Mexicans involved there has strong racial overtones. *See generally Greenfield v. Kates, Mexican Americans, Racial Discrimination, and the Civil Rights Act of 1866*, 63 Calif.L.Rev. 662 (1975). The fact that racial discrimination is an important component in a section 1981 cause of action is also clear from the Supreme Court's recent section 1981 decisions banning discriminatory admission policies in private schools and discrimination against whites in private employment. *See Runyan v. McCrary*, —— U.S. ——, 96 S.Ct. 2586, —— L.Ed.2d ——, 44 U.S.L.W. 5034 (1976); *McDonald v. Santa Fe Trail Transportation Co.*, —— U.S. ——, 96 S. Ct. 2574, —— L.Ed.2d ——, 44 U.S.L.W. 5067 (1976). Section 1981 thus allows relief for a limited range of particularly serious civil rights violations in which racial animus is implicated. In view of the fact that section 1981 has more restricted applicability than section 1983, the differences in statutory language that limit liability under section 1983 to "persons" but fail to similarly confine section 1981 liability, *see* notes 4 and 6, *supra*, do not seem unreasonable.

We do not interpret the District Court's finding that "[t]he re-assignment of plaintiff was not a result of a *pattern or practice* of discrimination" (emphasis supplied) as a holding that *no* racial discrimination was involved in the reassignment. To the contrary, its holding that the reassignment violated *Singleton* implies a finding of racial discrimination in Campbell's case, since *Singleton* enjoins only discriminatory demotions or dismissals in carrying out staff reductions necessitated by desegregation.

9. The availability of a section 1981 cause of action to remedy employment discrimination such as that suffered by Campbell here is supported by parallel developments in cases brought under section 1982. Section 1982 differs from section 1981 primarily in that it proscribes racial discrimination in the sale or rental of property, whereas section 1981 prohibits such discrimination in the making and enforcing of contracts and in a number of related contexts in which persons may be deprived of "the full and equal benefit of all laws and proceedings . . . enjoyed by white citizens." Just as section 1982 forbids discriminatory exclusion of blacks from available housing, *see Jones v. Alfred H. Mayer Co., supra*, so section 1981 proscribes discriminatory exclusion of blacks from available employment contracts and contract terms. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); *Johnson v. Goodyear Tire & Rubber Co.*, 5 Cir., 1974, 491 F.2d 1364; Comment, *Racial Discrimination in Employment Under the Civil Rights Act of 1866*, 36 U.Chi.L.Rev. 615, 617 (1969). *See also Cody v. Union Electric*, 8 Cir., 1975, 518 F.2d 978 (though claim that public utility required blacks to pay a higher security deposit than whites was not cognizable under section 1983 due to lack of state action, it did state a cause of action under section 1981); *Olzman v. Lake Hills Swim Club, Inc.*, 2 Cir., 1974, 495 F.2d 1333, 1339–40 (section 1981 bars discriminatory exclusion of black guests from a swimming club) (alternative holding). As the Supreme Court has noted in *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 439–40 & n. 11, 93 S.Ct. 1090, 1095 & n. 11, 35 L.Ed.2d 403 (1973), "[i]n light of the historical interrelationship between § 1981 and § 1982 [the operative language of both sections is traceable to the Civil Rights Act of April 9, 1866, c. 31, § 1, 14 Stat. 27], we see no reason to construe these sections differently"—at least in contexts where an exemption from the nondiscrimination requirements of the statutes is being asserted. *See also* Larson, *The Development of Section 1981 as a Remedy for Racial Discrimination in Private Employment*, 7 Harv. Civ. Rights-Civ.Lib.L.Rev. 56, 60–61 (1972).

firm `. . . etc., we affirm the District Court's holding that there was jurisdiction with regard to Campbell's claims against both the individual defendants [10] and the School Board under section 1981 and section 1343.

[8] Appellants further contend that Campbell's claims for back pay and attor-

neys' fees are barred by the Eleventh Amendment in accordance with *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The District Court apparently accepted this argument, at least with respect to the back pay issue, since its denial of back pay was predicated on *Edelman* concerns. As the Supreme Court in *Edelman* was careful to note, however,

---

Courts have repeatedly held that "§ 1982 is not a 'mere prohibition of state laws establishing or upholding' racial discrimination in the sale or rental of property but, rather, an 'absolute' bar to *all* such discrimination, private as well as public, federal as well as state." *District of Columbia v. Carter*, 409 U.S. 418, 422, 93 S.Ct. 602, 605, 34 L.Ed.2d 613 (1973) (emphasis in original); *see Gautreaux v. Chicago Housing Authority*, 7 Cir., 1974, 503 F.2d 930, aff'd sub nom. *Hills v. Gautreaux*, —— U.S. ——, 96 S.Ct. 1538, 47 L.Ed.2d 792, 44 U.S.L.W. 4480 (1976) (claim brought under both section 1981 and section 1982); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Jones v. Alfred H. Mayer Co., supra; Hurd v. Hodge*, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); *Penn v. Schlesinger*, 5 Cir., 1973, 490 F.2d 700, 702, *rev'd on other grounds*, 5 Cir., 1974, 497 F.2d 970 (en banc); *Jennings v. Patterson*, 5 Cir., 1974, 488 F.2d 436, 441–42. *See also Greenfield & Kates, supra* note 8, at 664; *Larson, supra*, at 57. Section 1981 relief seems particularly appropriate where, as here, the discrimination complained of arises directly from the failure to afford a black the same consideration as white citizens in the process of structuring new employment contracts necessitated by desegregation. *See* Comment, *supra*, 36 U.Chi.L.Rev. at 617–19.

10. Neither our prior decisions nor those of the Supreme Court rule out the possibility of obtaining section 1983 relief which is not, in substance, relief from a "non-person" under the statute. *Kenosha* involved an action seeking injunctive relief against a city, and *Adkins v. Duval County School Board*, 5 Cir., 1975, 511 F.2d 690, involved actions brought solely against school boards. As we indicated in *Adkins*,

the trial court could not, of course, have dismissed the suits for failure to allege a proper jurisdictional basis . . . [if] there [had] been individual party defendants, whom this Court has previously held to be 'persons' for purposes of . . . § 1983 . . . ."

511 F.2d at 696. The individual defendants named in Campbell's suit are "persons" within the meaning of section 1983. *See, e. g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Sterzing v. Fort Bend Independent*

*School Dist.*, 5 Cir., 1974, 496 F.2d 92, 93 n. 2. Appellants argue, however, that a suit brought against individual board members in their official capacity is indistinguishable from a suit against the board itself. While it is clear that we lack jurisdiction over claims for injunctive relief brought nominally against public officials in a thinly disguised effort to circumvent the "person" requirement of section 1983, *Muzquiz v. City of San Antonio*, 5 Cir., 1976, 528 F.2d 499 (en banc); *Warner v. Board of Trustees of the Police Pension Fund*, 5 Cir., 1976, 528 F.2d 505 (en banc), it does not follow that section 1983 relief is never available against public officers acting in their official capacities. *See McGill v. Parsons*, 5 Cir., 1976, 532 F.2d 484, n. 1; *Reeves v. City of Jackson*, 5 Cir., 1976, 532 F.2d 491; *Thurston v. Dekle*, 5 Cir., 1976, 531 F.2d 1264; *Gray v. Union County Intermediate Education Dist.*, 9 Cir., 1975, 520 F.2d 803, 805; *Harper v. Kloster*, 4 Cir., 1973, 486 F.2d 1134, 1137–38. In *Muzquiz*, the suit was, in substance, an action against an impermissible party. The question whether a section 1983 action will lie and whether section 1343(3) jurisdiction will attach hinges not on the nature of the relief sought (e. g., equitable or legal), but on whether or not the action is in substance an action against a "person" within the meaning of the statute. *See Muzquiz, supra*, 528 F.2d at 500–01.

While section 1983 would thus suffice as a basis of jurisdiction if Campbell's claim was merely a request for equitable reinstatement in a principalship, it is not adequate with regard to his claims for back pay and attorneys' fees. Relief in the form of restitution or damages is not available against officers of an entity which is a "non-person" under section 1983. *Thurston v. Dekle, supra; Muzquiz, supra*. Thus, Campbell would be unable to recover back pay under section 1983. *See also Monell v. Department of Social Services of the City of New York*, 2 Cir., 1976, 532 F.2d 259. Campbell's claim for attorneys' fees is predicated on 20 U.S.C. § 1617, *see* note 12, *infra*. Under this section, attorneys' fees may be awarded as costs "[u]pon the entry of a final order by a court of the United States against a local educational agency." Such a "final order" cannot be entered by a federal court acting under section 1983. *See Adkins v. Duval County School Bd., supra*.

a county does not occupy the same position as a State for purposes of the Eleventh Amendment. . . . [W]hile county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of the Eleventh Amendment.

415 U.S. at 667 n. 12, 94 S.Ct. at 1358 n. 12. Our post-*Edelman* cases involving actions for retrospective monetary relief against county school boards and similar entities have held that the Eleventh Amendment does not bar such awards so long as the entities sued are locally controlled, essentially local in character, and the funds to defray the award would not be derived primarily from the state treasury. *Adams v. Rankin County Board of Education*, 5 Cir., 1975, 524 F.2d 928, 929; *Hander v. San Jacinto Junior College*, 5 Cir., 1975, 519 F.2d 273, 279–80. *See also Incarcerated Men of Allen County Jail v. Fair*, 6 Cir., 1974, 507 F.2d 281, 287; *Miller v. Carson*, M.D.Fla., 1975, 401 F.Supp. 835, 848 n. 3; *Wright v. Houston Indep. School Dist.*, S.D.Tex., 1975, 393 F.Supp. 1149, 1151–58; *Smith v. Concordia Parish School Bd.*, W.D.La., 1975, 387 F.Supp. 887, 891; Note, *Damage Remedies for Constitutional Violations*, 89 Harv.L. Rev. 922, 931–32 & n. 57 (1976). Our analysis of the nature of Florida school boards in the context of determining their similarity to municipalities is sufficient to convince us that they are not the type of entities which are sheltered by the Eleventh Amendment. *See Adkins v. Duval County School Board*, supra, at 693. The lower court accordingly erred in holding that *Edelman* precluded consideration of Campbell's back pay claim. Parallel reasoning establishes our authority to consider Campbell's request for reasonable attorneys' fees.

## II. The *Singleton* Claim

■ Appellants attack Campbell's claim to a position as an elementary school principal under *Singleton v. Jackson Separate Municipal School District*, 5 Cir., 1969, 419 F.2d 1211, *cert. denied*, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970), on two grounds. First, they maintain that Campbell's reassignment as an assistant principal of a high school, far from being a "demotion" within the meaning of *Singleton*, was actually a promotion, and thus that Campbell suffered no cognizable *Singleton* injury. Second, they contend that even if the reassignment did constitute a demotion, no elementary school principalships have become available since the 1970 desegregation order was entered, and that at most, *Singleton* requires them to offer Campbell a principalship when a vacancy occurs. Neither of these arguments is sound.

In *Singleton*, "demotion" was defined as any re-assignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period.

419 F.2d at 1218. The District Court correctly applied these criteria in determining that Campbell had been demoted. Although Campbell received $300 more than an elementary school principal with comparable seniority during his first year as Assistant Principal and Desegregation Specialist at Chattahoochee High School, he earned $200 less in 1971–72, $500 less in 1972–73, and $500 less in 1973–74. In addition, Chattahoochee High was located approximately 22 miles from Campbell's home, which necessitated increased expenditure of time and money in getting to and from school. The new position also carried considerably less responsibility and required less skill than the prior principalship. Campbell no longer had responsibility for selecting and hiring faculty, making teacher assignments, presiding over faculty meetings, or officiating at other ceremonial events. As of September 1973, fewer pupils were enrolled at Chattahoochee than had been enrolled in Campbell's elementary school. Finally, the District Court found that an elementary

school principalship was more prestigious, both in general and in Campbell's specific case, than an assistant principalship at any level. The lower court thus did not err in concluding that Campbell had suffered a demotion as defined in *Singleton*.

Appellants' second argument misconceives the extent or protection afforded to those whose positions are affected by desegregation orders. It assumes that obligations under *Singleton* accrue only after integration-related dismissals or demotions have occurred and that compliance consists merely of giving those displaced priority in filling equivalent positions which subsequently become available. While this is certainly part of what *Singleton* demands,[11] the mandate in the case is much broader. It requires that if, as a result of the creation of a unitary school system,

> there is to be a reduction in the number of principals, teachers, teacher-aids, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable nondiscriminatory standards from among *all* the staff of the school district. . . . Prior to such a reduction, the school board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

419 F.2d at 1218 (emphasis added).

After reviewing the record in Campbell's case, it is clear that the appel-

lants failed to comply with these requirements in reassigning Campbell. As the District Court found, the school board has never developed written, objective, nonracial criteria to be used in connection with demotion or dismissal of school personnel. More important than appellants' failure to promulgate such criteria, however, was its failure to select the principal to be demoted "on the basis of objective and reasonable non-discriminatory standards from among *all* the staff of the school district." 419 F.2d at 1218 (emphasis added). In *United States v. Texas Education Agency*, 5 Cir., 1972, 459 F.2d 600, 607 n. 3, we suggested that appropriate objective criteria for determining which principal to displace in a *Singleton* situation included the degree or degrees held by the principal and the number of years of experience he or she had as a principal in the system being desegregated, as a principal in any system, and in education other than as a principal. Under these criteria, Campbell should not have been demoted.

As noted earlier, Campbell was the senior administrator in the Gadsden County system at the time the final desegregation order was entered. He had over thirty years of experience as a school administrator, and had served during at least fifteen of those years as a principal. He has been certified as an elementary and secondary school principal since 1952. By August of 1970, Campbell had more years of experience as a principal within the Gadsden County system than most of the other principals in the system had as educators in any capacity. The contrast between Campbell's experience and that of the last two white principals to be hired before entry of the final Gadsden County desegregation order is particularly sharp. The first of these, Charles D. Boyd, who was appointed on February 3, 1970 to an elementary school

---

11. Specifically, *Singleton* provides that

[I]f there is any . . . [desegregation related] dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dis-

missed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.
419 F.2d at 1218.

principalship commencing June 8, 1970, had served previously as an assistant principal and had a total of four years of educational experience. The second, Corbin W. Scott, who was hired just four days prior to entry of the integration order, had served previously as a teacher and had seven years of experience. Neither had any experience serving as principal while school was in session. In view of these facts, we conclude that the appellants decided to reassign Campbell only because his school was being phased out, and that this decision was made without any effort to compare his objective qualifications with those of other principals in the system in determining who should be demoted. We accordingly affirm the District Court's conclusion that Campbell's rights under *Singleton* were violated and its order that Campbell be placed in an elementary school principalship commencing with the 1975–76 school year.

### III. Attorneys' Fees and Other Relief

■ The District Court held that Campbell was entitled to an award of attorneys' fees, to be determined in accordance with the guidelines of *Johnson v. Georgia Highway Express*, 5 Cir., 1974, 488 F.2d 714. Campbell's claim for such an award is predicated on a provision of the 1972 Emergency School Aid Act, 20 U.S.C. § 1617, which allows a federal court, in its discretion, to grant a reasonable attorney's fee as part of the costs upon entry of a final order against a local educational agency.[12] We have previously construed this provision as applying in cases where *Singleton* violations have been established. *Ward v. Kelly*, 5 Cir.,

1975, 515 F.2d 908, 912; *Thompson v. Madison County Board of Education*, 5 Cir., 1974, 496 F.2d 682, 689–90; see *Johnson v. Combs*, 5 Cir., 1972, 471 F.2d 84, *cert. denied*, 413 U.S. 922, 93 S.Ct. 3063, 37 L.Ed.2d 1044 (1973). Our review of the record reveals no facts that indicate the proceedings in this case were not necessary to bring about compliance with *Singleton* and no special circumstances which would render such an award unjust in this case. See *Northcross v. Board of Education of Memphis City Schools*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973); *Ward v. Kelly*, *supra*, at 912; *Henry v. Clarksdale Municipal Separate School Dist.*, 5 Cir., 1973, 480 F.2d 583. Because the Gadsden County District School Board is not an entity protected by the Eleventh Amendment, as previously discussed, *Edelman v. Jordan* poses no bar to an award of attorneys' fees, and the District Court correctly concluded that they should be awarded.

■ Campbell is also entitled to an award of back pay and compensatory seniority, in accordance with prior cases which expressly consider the availability of such relief under section 1981, see, e. g., *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); *Guerra v. Manchester Terminal Corp.*, 5 Cir., 1974, 498 F.2d 641; *Johnson v. Goodyear Tire & Rubber Co.*, 5 Cir., 1974, 491 F.2d 1364; and with those, such as *Singleton* and its progeny, see, e. g., *Ward v. Kelly*, *supra*; *Lee v. Macon County Board of Education*, 5 Cir., 1971, 453 F.2d 1104, 1114, in which section 1981 was available as an alternative basis of jurisdiction.[13]

---

12. 20 U.S.C. § 1617 provides:

Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this chapter or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the pre-

vailing party, other than the United States, a reasonable attorney's fee as part of the costs.

13. Few of our cases have expressly considered the availability of section 1981 as a basis for jurisdiction in *Singleton*-type cases, in part, no doubt, because prior to *Kenosha* and *Adkins* there was clear authority supporting jurisdiction with regard to back pay claims under section 1983. See, e. g., *Harkless v. Sweeny Independent School Dist.*, 5 Cir., 1970, 427 F.2d 319, *cert. denied*, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971). Since demotions and dismissals effected by school boards inevitably

**659**

Since the District Court failed to award back pay, we remand the case for a determination of the amount due to Campbell in this regard.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Maurice WILEY and William Earl Patrick O'Donnell, Defendants-Appellants, Nos. 75–1551 and 75–1552 (two cases).**

**Nos. 75–1551 and 75–1552.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1975.

Decided Feb. 25, 1976.

Rehearing Denied June 11, 1976.

constituted state action in the sense required for section 1983 jurisdiction, there was no need to assert jurisdiction under section 1981 as well. As noted earlier, however, the Supreme Court has breathed renewed life into sections 1981 and 1982 in the past decade. *See, e. g.,* Supreme Court cases cited in note 9, *supra. See also Johnson v. Goodyear Tire & Rubber Co.,* 5 Cir., 1974, 491 F.2d 1364, 1378. This revitalization of provisions derived from the 1866 Civil Rights Act has established the existence of a cause of action under section 1981 which, though narrower in scope than that under section 1983, is broad enough to confer jurisdiction with regard to back pay claims where a public entity has failed to treat a black in the same manner as similarly situated whites in the course of arranging its contractual relationships with its employees. We do not view *Kenosha* or *Adkins* as completely undermining the jurisdictional foundation of the innumerable reinstatement and back pay cases that this court has handed down in the course of supervising school desegregation in the Deep South.

Eugene C. Gaerig, Memphis, Tenn. (Court-appointed), and Hal Gerber, Gerber & Gerber, Memphis, Tenn., for defendants-appellants.

Thomas F. Turley, Jr., U. S. Atty., Larry E. Parrish, Asst. U. S. Atty., Memphis, Tenn., for U. S.

Before WEICK, MILLER and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

James Maurice Wiley and William Earl Patrick O'Donnell were convicted in a jury trial in the United States District Court for the Western District of Tennessee of conspiracy to commit mail fraud, 18 U.S.C. § 371. Wiley was also convicted of a substantive count of mail fraud in the same trial. 18 U.S.C. § 1341; 18 U.S.C. § 2(b).

The government alleged that defendant Wiley requested his barber Sherman Roy Dean to set his houseboat on fire in order to collect the insurance proceeds of $3,817 for the loss of the boat and its contents. Dean enlisted the help of a number of his acquaintances including defendant O'Donnell. After two unsuccessful attempts, Dean, O'Donnell, and others succeeded in burning the boat. In the trial below, Dean testified for the government.

Of the numerous assignments of error made by both defendants, we have concluded that the only claim of error meriting extended discussion is the contention that defendants were deprived of a fair trial because of prosecutorial misconduct. We further conclude that such misconduct requires reversal and new trial of the charges against the defendant Wiley, but not against the defendant O'Donnell.

This Circuit has many times expressed itself fully upon the issue of misconduct of government counsel in the prosecution of criminal cases. See, generally, *United States v. Calvert,* 498 F.2d 409 (6th Cir. 1974); *United States v. Smith,* 403 F.2d 74 (6th Cir. 1968); *United States v. Nemeth,* 430 F.2d 704 (6th Cir. 1970); *United States v. Perry,* 512 F.2d 805 (6th Cir. 1975), and most recently, in *United States v. Blanton,* 520 F.2d 907, No. 74–2113, (6th Cir. decided July 29, 1975). Our decisions in this area have been in recognition of the standard of conduct imposed upon the prosecution of

federal crimes as outlined in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). In *Berger,* the United States Supreme Court, noting that the case against the defendant there depended mainly upon the testimony of an accomplice with a long criminal record, reversed conviction on a finding that the government attorney was guilty of

"misstating the facts in his cross examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof is offered; of pretending to understand that a witness had said something which he had not said, and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general of conducting himself in a thoroughly indecorous and improper manner."

*Berger v. United States, supra,* at 84, 55 S.Ct. at 631.

In our review of prosecutorial conduct claimed improper on direct appeal, we are not limited by the narrower standards which have confined federal intervention in state proceedings to violations of federally guaranteed constitutional right, see *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Thus, as in *United States v. Peak,* 498 F.2d 1337 (6th Cir. 1974), the standards of *Berger v. United States, supra,* apply in full force and particularly its observation that:

"Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

*Berger v. United States, supra,* 295 U.S. at 88, 55 S.Ct. at 633.

The principal charge of misconduct is defendant Wiley's claim that the Assistant United States Attorney prejudicially interjected before the jury testimony that Wiley

had unlawfully dealt in stolen jewelry; in short, that Wiley was a fence for Dean and others. The first such occurrence appears in the government's case-in-chief when the Assistant United States Attorney asked Dean:

"Q. Have you ever referred any people to Mr. James Maurice Wiley for the purpose of dealing in stolen property?

A. Yes, sir."

When defense counsel objected, the court asked the prosecutor to rephrase the question, whereupon the Assistant United States Attorney elicited from Dean further testimony that he had sold a diamond ring to Mr. Wiley. While this ring appears to have been the personal property of Mr. Dean, the Assistant United States Attorney drew Dean out further:

"Q. Did you ever refer other people to him?

A. Yes, sir.

Q. For what purpose?

A. There was a fellow here in town that had some rings, and he came by and wanted to know if I was interested in them, and I told him 'no', but I called Mr. Wiley about it.

Q. Did you talk to Mr. Wiley about those rings?

A. Yes. sir.

Q. Was this just one or two?

A. No, sir. It was a tray of rings.

Q. How many?

A. I don't have any idea.

Q. Was it more or less than ten, or about ten, or do you have any recollection?

A. Just a small tray of rings.

Q. Did you tell Mr. Wiley anything about those rings?

A. I told him they were stolen.

Q. Did he agree to look at them or see them?

A. Yes, sir."

Upon objection, the court, out of the presence of the jury, observed that:

"It is my thought that Mr. Parrish should not ask questions which go to whether or not the items were stolen. He may cer-tainly go back and establish the relationship that existed, and that would include whether or not this witness told Mr. Wiley that he was of the criminal type. . . ."

Later the jury was brought back in and the trial judge thereupon sought to explain to the jury his ruling that the testimony which had been elicited from Dean was to be disregarded:

"The Court ruled and instructs you that Mr. Wiley is a defendant in this trial for the charges set forth in the indictment, and that is all.

The Court instructs you that any testimony that he has been a participant in any other type of misconduct with regard to jewelry that was stolen is not an issue in this case.

Therefore, any testimony from which you might have inferred that he was should be disregarded, and the court has ruled that the relationship that this witness might be asked to testify concerning the nature of his relationship with Mr. Wiley and his contacts with him, and their business dealings, are relevant.

I might say that the Court will instruct you later that there is another rule of law that there are various ways of impeaching a witness' testimony, and one of those ways is to show that a witness who is called to testify might be considered for impeachment if he has been guilty of a felony previous to his testimony. I will have more to say about this later, but this is true of any witness, and the lawyers are usually informed enough to bring that out, and they will address you later as to the effect it should have.

I believe these remarks are what the Court would consider appropriate in light of the problem called to the Court's attention.

Mr. Parrish, you may proceed."

■■■ The Assistant United States Attorney sought to justify his effort to interject the suggestion that Wiley dealt in stolen goods by the contention that the testimony was necessary to establish the confi-

dential nature of Wiley's relationship with Dean, thus increasing the probability that Wiley would have approached his barber with the illegal design to burn the houseboat. While we agree with the government that the existence of a close relationship is relevant to the question of whether Wiley would confide in Dean, see generally *United States v. Kraft*, 407 F.2d 1065 (6th Cir. 1969), the countervailing policy is the degree of prejudice resulting from the admission of the testimony. As a general rule, evidence concerning the commission of crimes other than that charged in the indictment is inadmissible, not because such evidence might not be relevant, but that the resulting prejudice would be too great. *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

■ However, as Judge McCree's scholarly discussion in *United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975) notes, certain exceptions to the general rule exist in attempts to prove motive, intent, absence of mistake or inadvertence, identity of the offender or a common plan, pattern or scheme. The government in this case does not attempt to justify the introduction of its evidence into any of the above categories, nor does it appear that the government would succeed if it had argued any of the exceptions. We need not consider whether the categories are exhaustive, *United States v. Ring, supra*, at 1004, n. 2, for even under the broader balancing test as delineated in *United States v. Woods*, 484 F.2d 127, 134 (4th Cir. 1973), *cert. denied*, 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974), the challenged testimony is clearly inadmissible. The harm to the defendant far outweighed any need of the government to show the nature of the relationship between Wiley and Dean.

While it is true here that the trial judge did eventually rule Dean's affirmative answer to be inadmissible and instructed the jury to disregard it, it is the claim of Wiley's counsel that the court could not "unring the bell".

We are not willing to say that in another case, a prompt and clear admonition by the court to the jury to disregard such testimony might not be effective to erase possible prejudice. Here we conclude that it was not. We cannot be satisfied that the trial judge's ruling and admonishment was so unequivocal as to erase any possible harm. On the contrary the impact of the court's instruction was that the evidence might later become relevant for impeachment purposes; the inference was that it might be shown that the defendant Mr. Wiley was in fact guilty of a felony. Rather than curing the error, it is our conclusion the purport of the court's instructions merely compounded it.

The suggestion of Wiley's complicity with stolen goods was in addition accentuated by the Assistant United States Attorney's second attempt to introduce challenged testimony by Dean. Later in the trial, after Wiley had testified in his own defense, the prosecution recalled Dean as a rebuttal witness and asked the following question:

> "Mr. Dean, have you ever heard, before you were incarcerated, have you ever heard a rumor in the community of Memphis concerning Mr. Wiley, that he was a person that dealt in stolen jewels?"

The government's theory was that since Wiley had put his good character in issue, rebuttal testimony was permissible. The district court sustained the objection to its admission, however, when Dean admitted that he was unfamiliar with Wiley's reputation among his neighbors and acquaintances in the community. Our view of the matter is that the Assistant United States Attorney committed error in the first instance by even asking the question on direct examination.[1] It is settled that

---

1. We understand the rule to be no different under the new Federal Rules of Evidence. See Rules 404 and 405. As observed in the Advisory Committee's Note to Rule 405:

   "Of the three methods of proving character provided by the rule, evidence of specific instances of conduct is the most convincing. At the same time it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time. Consequently the rule confines the use of evidence of this kind to cases in which character is, in

the strict sense, in issue and hence deserving of a searching inquiry. When character is used circumstantially and hence occupies a lesser status in the case, proof may be only by reputation and opinion. These latter methods are also available when character is in issue. This treatment is, with respect to specific instances of conduct and reputation, conventional contemporary common law doctrine."